# United States Court of Appeals
## For the First Circuit

No. 15-2144

UNITED STATES OF AMERICA,

Appellee,

v.

MARK J. ZIMNY,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Torruella, Thompson, and Kayatta,
Circuit Judges.

John M. Thompson, with whom Linda J. Thompson, Robert F. Hennessy, and Thompson & Thompson, P.C. were on brief, for appellant.

Vijay Shanker, Attorney, United States Department of Justice, Criminal Division, Appellate Section, with whom Leslie R. Caldwell, Assistant Attorney General, Sung-Hee Suh, Deputy Assistant Attorney General, Carmen M. Ortiz, United States Attorney, Victor A. Wild, Assistant United States Attorney, and Giselle Joffre, Assistant United States Attorney, were on brief, for appellee.

January 24, 2017

**THOMPSON**, <u>**Circuit Judge**</u>.  A jury found the defendant, Mark J. Zimny (Zimny), guilty of five counts of wire fraud, five counts of engaging in unlawful monetary transactions, two counts of filing false tax returns, and one count of bank fraud.  Zimny appeals, raising several arguments for our review.  In this opinion, we address only one of these contentions:  that the district court's inquiry into Zimny's claims of juror misconduct was inadequate.[1] We agree and remand for an evidentiary hearing, leaving for another day the other issues that Zimny raises.

## Background

We recount only those facts necessary to give context to the juror-misconduct issue that we consider in this appeal.[2]

### A.    The Scheme

Zimny operated an educational-consulting business called Ivy Admit.  Ivy Admit's primary client base consisted of Chinese and South Korean parents eager to send their children to elite boarding schools and universities in the United States.  In 2007,

---

[1] In addition to this contention, Zimny also argues that the district court's denial of his motion for a continuance deprived him of his Sixth Amendment right to counsel of choice and that the district court erred in denying his challenge to the joinder of the bank-fraud counts.

[2] Because Zimny is not challenging the sufficiency of the government's evidence and the precise manner in which we chronicle the backstory has no impact on our decision, we elect to present the facts in a balanced fashion.  <u>See</u> <u>United States</u> v. <u>Vázquez-Larrauri</u>, 778 F.3d 276, 280 (1st Cir. 2015); <u>United States</u> v. <u>Rodríguez-Soler</u>, 773 F.3d 289, 290 (1st Cir. 2014).

Zimny approached Gerald Chow (Gerald), who lived in Hong Kong with his wife, Lily. Zimny explained that Ivy Admit assists Asian students applying to boarding schools and colleges in the United States. Intrigued, the Chows hired Zimny to provide educational-consulting services to their two teenage sons while the boys studied in the United States; Zimny was tasked with acting as their sons' guardian, arranging for tutors, recommending schools, and accompanying the Chow children on school tours.

But these services were just a small piece of the pie that Ivy Admit offered. What made Ivy Admit truly valuable, Zimny explained to Gerald, was its ability to overcome the prejudice that American boarding schools supposedly exhibit towards Asian applicants. An Asian student's application goes nowhere, Zimny explained, unless the school receives a donation, known as a "development contribution," from the applicant's family. But it's not that simple, Zimny told Gerald; an applicant's family can't simply cut the school a check — that looks way too fishy. Instead, schools will accept development contributions only through an intermediary that the school knows. Zimny assured Gerald that Ivy Admit fit this bill.

On five different occasions in 2008, Zimny requested money to be used as development contributions on behalf of the Chow children. Each time, the Chows complied, wiring the money to Zimny. On two of these occasions, the Chows expressed concern

about the size of the payment requested and the possibility that the schools might deny one son's applications; Zimny assured the Chows that, if the schools rejected the applications, the money would be returned to them. In total, the Chows wired approximately $675,000 to Zimny for development contributions in 2008.

Instead of delivering the funds to the schools as promised, Zimny pocketed the money. He used it for a variety of personal expenses, including transfers to his personal checking account, payment of credit card bills, and a payment made in connection with his purchase of an apartment.

By the fall of 2009, the jig was up. Fortuitously, the head of one of the boarding schools to which Zimny had supposedly made a development contribution on the Chows' behalf happened to be in Hong Kong. Gerald met with her, and, when he asked whether the school had received the Chows' donation from Zimny, she responded that the school had received no such donation. Soon after, in February 2010, the Chows ended their relationship with Zimny and demanded a return of all of the development-contribution funds that had not been donated as promised. Zimny refused to refund the money and advised the Chows that, given the sensitive nature of some of the work that Ivy Admit performed for them, it would be best not to pursue the matter further "to ensure privacy for all in the United States and Hong Kong." The Chows thought otherwise; they sued Zimny later that year.

## B. The Criminal Trial

Zimny's conduct also came across the federal government's radar. A grand jury issued an indictment that charged him with five counts of wire fraud, five counts of engaging in unlawful monetary transactions, two counts of filing false tax returns, and two counts of bank fraud.[3] Zimny elected to stand trial before a jury. After the jury was impaneled, the district court admonished the jurors to refrain from discussing the case. This admonition was repeated (only) twice throughout Zimny's thirteen-day trial. In addition, the district court instructed the jury on the twelfth day of trial to avoid any media coverage of the case. As far as we can tell, this is the only time that such an instruction was given. Finally, during its final charge to the jury, the district court admonished the jurors to "decide the case based on the evidence that has been presented" and that "[a]nything you may have heard outside the courtroom about this case is not evidence and should not be considered." The district court did not expressly instruct the jurors to refrain from conducting independent internet research on the case or the parties involved.

---

[3] Given the tack we take in this opinion, we need not chronicle the facts giving rise to the false-tax-return and bank-fraud charges or examine the degree to which these offenses are connected with the other ten counts.

On several occasions during trial, one or more jurors did not show up to the courthouse. On the fourth trial day, Juror No. 8 was unable to report for duty. After conferring with counsel, the district court elected to recess the trial until the following morning. As hoped, Juror No. 8 returned the next day, a Friday, and trial proceeded as scheduled. But Juror No. 8 once again was unable to make it to the courthouse the following Monday, this time due to sickness, and the court again recessed for the day. The court and the parties agreed that, if Juror No. 8 was absent again the following day, an alternate juror would take her place. The next morning, Juror No. 8 was absent again, and, as promised, the court replaced her with an alternate.

The trial proceeded without any more juror-attendance hiccups. The jury acquitted Zimny of one the bank-fraud charges and found him guilty on all other counts.

## C. The Blog and the Efforts to Obtain a New Trial

A federal district court in Boston was not the only place where Zimny stood trial. Before, during, and after this criminal proceeding, comments on a blog post ensured that Zimny's conduct was also aired in the court of public opinion.

In October 2012 — before Zimny was indicted — the Chows' ongoing civil litigation against Zimny was discussed in a post entitled "The Harvard Admissions Lawsuit" on a blog called "Shots in the Dark." The blog post received several hundred comments,

the vast majority of which were posted anonymously, from individuals we shall call commentators.[4]  The comments began immediately after the blog entry was posted, and they continued to roll in for the two-and-a-half years that transpired before Zimny was convicted.  In addition to discussing the criminal case and the Chows' civil litigation against Zimny, the commentators also shared details of Zimny's personal life and allegations of similar fraudulent conduct on his part.

Many of these comments painted Zimny in an unfavorable light.  Here's a small sampling:

- "Zimny's personal life is full of deceits & frauds . . . . He exploits rich [A]sian women pretending to be a wealthy Harvard-grad business man."
- "Zimny is a con-man, pure and simple.  He is being sued all over the place for fraud . . . . He is a cancer."
- "I remember this scumbag.  Asiaphile creep con artist with an ultra evil alter ego.  Justice awaits."
- "[H]as the criminal already been jailed yet?"
- "This leech has NOT ONE redeeming quality."
- "EVERYTHING that comes out of his filthy mouth is [a] lie . . . ."
- "[T]here are a lot of [A]sian families watching over this law suit [sic] just to see him being jailed . . . . The [C]hows is [sic] just the tip of the huge iceberg."
- "He is quite simply the most vile, despicable human being I have ever observed.  He thinks only of himself and has absolutely no regard or remorse for other people.  He moves like a Great White Shark, devouring any pray [sic]

---

[4] At the time Zimny filed his motion for a new trial, the blog post garnered over 250 comments.  As of this date, over 300 comments have been posted.  See Richard Bradley, The Harvard Admissions Lawsuit, Shots in the Dark (Oct. 9, 2012), http://www.richardbradley.net/shotsinthedark/2012/10/09/the-harvard-admissions-lawsuit/ (last visited Jan. 23, 2017).

he can. He especially likes to victimize Asian people whether through scams, contrived lawsuits or womanizing."

- "No punishment is too great for this disgusting piece of shit."

- "Feds don't bother to indict unless they're pretty sure of getting somewhere with the charges . . . . It's like [Zimny] can't NOT be dishonest. Never stops lying, and never stops attempting to cheat and steal from people who believe the lies."

- "I honestly cannot find one redeeming quality in Zimny. He is a wretched human being . . . . Must feel terrible to be the parents of a human horror like him."

- "The worst part is that now we, the taxpayers, will have to pay to house/feed this miserable piece of shit on a [sic] prison. Hopefully, he'll rot away quickly."

- "Zimny is that 1% of the 1% of sociopaths completely devoid of empathy and conscience. Just an insatiable black-eyed shark ceaselessly on the hunt for victims. I feel sorry for his parents. There's no way in hell Zimny is a bi-product [sic] of some childhood wounds. He's a genetic defect."

- "I have no doubt that any jury with an IQ above body temperature will convict Zimhole. I only fear that his defense undoubtedly tried to seat as many morons as possible in order to confuse them . . . ."

The comments were so inflammatory that, on two occasions, the author of the blog post threatened to delete the post and the accompanying comments; he explained that "[t]his is a blog for discussion, not hate. And certainly not violence."

Meanwhile, back in federal court, the government was aware of and occasionally viewed the blog-post comments. And, hot on the heels of the jury verdict, the government informed Zimny's defense team of blog-post comments from the night before the verdict was returned that were authored by an anonymous poster who claimed to have been a juror in Zimny's criminal trial. In

response to comments requesting status updates on the trial, an anonymous commentator responded: "It's gone a week longer than the judge has hoped dude [sic] to Lily Chows [sic] testimony. When I left the jury last week due to an illness they were 50/50." When an intrigued fellow commentator asked "[w]ho was 50/50," this anonymously posted answer followed: "The jury. Half saw him guilty and the others didn't."

After learning of these comments, Zimny filed a motion for a new trial, asking the district court to conduct an inquiry into whether the jurors were exposed to extraneous information or engaged in premature deliberations. The government agreed that the district court should question Juror No. 8 about these comments, and the court did so.

During the court's examination of Juror No. 8, she admitted authoring the comments in question. The juror testified, under oath, that she had not visited the blog — or read anything else about the case — during her jury service; it was only after she left the jury that she had found the blog. Juror No. 8 also testified that she had not discussed the case with any of the other jurors while she was serving on the jury. Her assessment of the jurors — that half saw Zimny guilty and the other half viewed him as not guilty — was instead based on Juror No. 8's interpretation of "the way that [the jurors] would sigh on certain things" and jurors' "body language." Finally, Juror No. 8 testified that she

had not authored any of the other comments on the blog post. After completing its own questioning of Juror No. 8, the district court permitted Zimny to propose additional questions for the district court to ask the juror; Zimny took the district court up on this offer, proposing several questions that the district court, in turn, posed to Juror No. 8. At the conclusion of Juror No. 8's testimony, Zimny requested that the court examine the other jurors; the court denied that request, concluding that Juror No. 8's testimony did not necessitate that step.

Zimny filed a motion for reconsideration of the district court's refusal to examine the jurors. Initially, the motion was based on a comment that was posted after Zimny filed his motion for a new trial but before the hearing at which Juror No. 8 was questioned. This commentator — writing anonymously, like so many others who commented on the blog post — suggested that, if Juror No. 8 testified that "it was just her 'impression' or 'feeling' that the other jurors thought Zimny was guilty[,] then Juror #8 will be sent home with the court's thanks." Zimny argued that, because Juror No. 8 admitted in her testimony that she reviewed the blog post shortly before her testimony, the similarity between her in-court testimony and the suggestion of the anonymous commentator rendered her testimony "entirely unreliable."

Four days later, Zimny alerted the district court to yet another anonymous comment on the blog post; this comment had been

posted earlier that day by someone who claimed to have been a juror on Zimny's criminal trial. The comment, which we shall call the additional-juror comment, read as follows:

> Boy this is getting comical. I've been following it on and off, and was also on the jury. Mama June, and those who were there know what I'm talking about,[5] was spouting about the "shots in the dark" blog since day one. Its [sic] why she conveniently got 'sick' and didn't finish her service. Several other jurors told her to stfu[6] and got annoyed. '[I]diot' doesent [sic] describe the half of it.

This comment, Zimny argued, suggested that, contrary to Juror No. 8's in-court testimony, she in fact had discussed the blog with other jurors. Zimny insisted that this additional-juror comment required the district court to examine the other jurors.

The district court denied the motion for reconsideration without explanation. Zimny timely appealed.

**Analysis**

Zimny argues that the district court failed to adequately investigate his claims that the jury was exposed to extraneous prejudicial information — the blog post and its comments

---

[5] For those, like us, who weren't there, Zimny explains that "Mama June" is the name of a character from the reality show Here Comes Honey Boo Boo and asserts that Juror No. 8 bore a striking resemblance to this character. The government does not dispute this assertion.

[6] For those unfamiliar with the term, "stfu" is an acronym for a particularly emphatic way to tell someone to be quiet: "Shut the f*** up!" See Stfu, Urban Dictionary, http://www.urbandictionary.com/define.php?term=stfu (last visited Jan. 23, 2017).

- 12 -

— and that the jurors engaged in premature deliberations.  We review the district court's response to these allegations of juror misconduct for abuse of discretion.  See United States v. Rodriguez, 675 F.3d 48, 58 (1st Cir. 2012); United States v. Mikutowicz, 365 F.3d 65, 74 (1st Cir. 2004).

A defendant bears the burden of coming forward with an allegation of juror misconduct that is colorable or plausible. Mikutowicz, 365 F.3d at 75; see also Rodriguez, 675 F.3d at 58. Although "courts generally 'should be hesitant[] to haul jurors in after they have reached a verdict . . . to probe for potential instances of bias, misconduct, or extraneous influences," Neron v. Tierney, 841 F.2d 1197, 1205 (1st Cir. 1988) (alteration in original) (quoting United States v. Moon, 718 F.2d 1210, 1234 (2d Cir. 1983)), "a trial court has an unflagging duty adequately to probe a nonfrivolous claim of jury taint," United States v. Paniagua-Ramos, 251 F.3d 242, 250 (1st Cir. 2001); see also United States v. Yeje-Cabrera, 430 F.3d 1, 11 (1st Cir. 2005) (quoting this language).  Thus, where a defendant makes a colorable or plausible claim of juror misconduct, the district court must investigate it.  See Rodriguez, 675 F.3d at 58; Paniagua-Ramos, 251 F.3d at 250; United States v. DeLeon, 187 F.3d 60, 67 (1st Cir. 1999); United States v. Rogers, 121 F.3d 12, 17 (1st Cir. 1997); United States v. Meader, 118 F.3d 876, 880 (1st Cir. 1997);

United States v. Boylan, 898 F.2d 230, 258 (1st Cir. 1990); Neron, 841 F.2d at 1201, 1202-03 & n.6.[7]

In cases where the district court is obliged to investigate, "the court nonetheless 'has broad discretion to determine the type of investigation which must be mounted.'" Rodriguez, 675 F.3d at 58 (quoting Meader, 118 F.3d at 880). While a "fullblown evidentiary hearing" is an option, one is not necessarily required. Id. (quoting Boylan, 898 F.2d at 258). "Instead, the court's 'primary obligation is to fashion a responsible procedure for ascertaining whether misconduct actually occurred and if so, whether it was prejudicial.'" Id. (quoting Boylan, 898 F.2d at 258). "The touchstone is reasonableness: did the trial court fashion, and then even-handedly implement, a sensible procedure reasonably calculated to determine whether

---

[7] Similarly, we have remarked that an inquiry of the jurors should be conducted "when 'reasonable grounds for investigation exist,' i.e., 'there is clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant.'" United States v. Connolly, 341 F.3d 16, 34 (1st Cir. 2003) (quoting Moon, 718 F.2d at 1234); see also United States v. Villar, 586 F.3d 76, 83 (1st Cir. 2009) (quoting this language). And we have recognized that, in some cases, an initial inquiry is necessary to determine whether reasonable grounds for investigation exist. See, e.g., Bouret-Echevarría v. Caribbean Aviation Maint. Corp., 784 F.3d 37, 48-49 & n.9 (1st Cir. 2015) (concluding that district court should have convened evidentiary hearing and questioned nonjuror witnesses who reported juror misconduct in order to determine whether inquiry of jurors was warranted).

something untoward had occurred?"  Paniagua-Ramos, 251 F.3d at 249-50.

Notwithstanding this broad discretion, however, a district court "judge does not have discretion to refuse to conduct any inquiry at all regarding the magnitude of the taint-producing event and the extent of the resulting prejudice" if confronted with a colorable claim of juror misconduct.  United States v. Lara-Ramirez, 519 F.3d 76, 87 (1st Cir. 2008).  In the last analysis, "[i]t is the circumstances of each case that will determine the level of inquiry necessary."  Rodriguez, 675 F.3d at 61; see also Paniaqua-Ramos, 251 F.3d at 250 ("[C]laims of jury taint are almost always case-specific.").

In this case, Zimny's evidence of juror misconduct did not come before the district court all at once.  Initially, Zimny requested the district court to conduct an inquiry on the basis of Juror No. 8's blog-post comments.  After hearing her testimony, Zimny unsuccessfully attempted — both at the hearing and in his first filing in support of his motion for reconsideration — to persuade the district court that, because Juror No. 8's testimony was unworthy of belief, all of the jurors needed to be questioned. Then, apart from this Juror No. 8 evidence, Zimny argued in a second filing that the additional-juror comment also necessitated an inquiry of all of the jurors.  In recognition of the staggered manner in which Zimny presented this evidence to the district

- 15 -

court, we first review the adequacy of the district court's treatment of the Juror No. 8 evidence before turning to its response to the additional-juror comment.

## A. Juror No. 8 Evidence

Zimny first argues that the district court's initial inquiry into Juror No. 8's blog-post comments was deficient. He insists that the court's refusal to examine the remaining jurors is unsupportable in the absence of an explicit determination of Juror No. 8's credibility and explicit findings of fact. We discern no abuse of discretion in the district court's initial inquiry.

The district court thoroughly questioned Juror No. 8, and this questioning focused on both of Zimny's juror-misconduct claims. The court explored Zimny's allegation of premature deliberations by repeatedly asking Juror No. 8 whether she discussed the case with her fellow jurors. When Juror No. 8 steadfastly responded that she had not done so, the district court pressed further, demanding to know what Juror No. 8's assessment of the jurors as being "50/50" could possibly be based on if no discussions took place. The court also asked questions aimed at addressing Zimny's allegation that the jurors had been exposed to the blog post and its comments during trial. Juror No. 8 repeatedly assured the court that she had not known of or visited the blog until after she had left the jury and that she discovered

the blog not through discussions with other jurors but by independent research. After observing Juror No. 8's testimony from the front-row seat that the district court occupied, the judge concluded that she did "not believe [Juror No. 8's] testimony requires" questioning the other jurors.

To be sure, the district court did not explicitly declare that it found Juror No. 8's testimony to be credible. But, after reviewing the entirety of the court's examination of Juror No. 8, we are convinced that the district court implicitly reached this conclusion. Cf. Applewood Landscape & Nursery Co. v. Hollingsworth, 884 F.2d 1502, 1505 (1st Cir. 1989) (discerning an implicit credibility finding from a statement of the district court). Necessarily implicit in the judge's statement that she did not believe that an examination of the other jurors was required based on Juror No. 8's testimony was the conclusion that she believed Juror No. 8, who testified under oath, that (1) no premature deliberations or discussions about the case occurred and (2) she did not expose the other jurors to the blog-post comments because she discovered the blog post only after she left the jury. Cf. United States v. Newman, 982 F.2d 665, 670 (1st Cir. 1992) (concluding from district court's stated reasons in support of its denial of defendant's motion for new trial premised on juror misconduct that district court "implicitly determin[ed] that there had been no prejudice to [defendant]"). We will not disturb this

- 17 -

credibility determination, which was reached after an extensive inquiry.[8]  See Meader, 118 F.3d at 881 ("Assessment of [a] juror's credibility as [the juror] responds to the [court's] questioning is uniquely the domain of the district court . . . .").  In sum, the district court's initial response to Zimny's claims of juror misconduct was, at that juncture, reasonable.  Therefore, the district court's initial inquiry does not constitute an abuse of discretion.  See Paniagua-Ramos, 251 F.3d at 249-50.

Zimny next contends that the district court erred in refusing to undertake a further investigation when Zimny's motion for reconsideration alerted the district court to the possibility that Juror No. 8's testimony was influenced by other blog-post comments.  The government fires back that this argument is sheer speculation, presumably because (as it argued below) Juror No. 8 received advice from counsel before facing the court's questions.  Neither party's position is entirely free from conjecture, but we need not dwell on this point because we can affirm the district

---

[8] In support of his argument that Juror No. 8 testified dishonestly, Zimny notes that she incorrectly stated that her blog-post comments were not in response to questions when, in fact, they were.  This error was plainly apparent to the district court; the very next question that the court posed tracked the language of the blog-post comment that prompted the first of Juror No. 8's comments:  "Did somebody ask whether anybody attended the trial, would have any information about it?"  And, even though the district court knew that Juror No. 8's comments were prompted by questions, it nonetheless implicitly found her testimony to be credible.  We will not second-guess that determination.

court's denial of this aspect of the motion for reconsideration on any ground supported by the record.  See United States v. Siciliano, 578 F.3d 61, 73 n.7 (1st Cir. 2009); cf. United States v. Connolly, 504 F.3d 206, 212 (1st Cir. 2007) (explaining that, "[w]hen the trial court has not expounded its rationale, the court of appeals will peruse the record, identify the issues and the controlling legal rules, and review the denial of the motion [for a new trial] accordingly").

The comments that supposedly influenced Juror No. 8's testimony were posted before the evidentiary hearing where she testified.  And Zimny knew about the blog post before these comments were posted.  In addition to knowing about the blog post and its comments in advance of the evidentiary hearing, Zimny was given the opportunity to propose questions for the court to ask Juror No. 8.  He availed himself of this opportunity, but none of the questions he proposed related to the potential that Juror No. 8's testimony was slanted by other comments on the blog.  In these circumstances, there was no abuse of discretion in rejecting this aspect of Zimny's motion for reconsideration.  See United States v. Allen, 573 F.3d 42, 53 (1st Cir. 2009) (explaining that "[w]e review the denial of a motion for reconsideration for abuse of discretion" and that such motions "are not to be used as 'a vehicle for a party to undo its own procedural failures [or] allow a party to advance arguments that could and should have been presented to

the district court prior to judgment'" and "are appropriate only in a limited number of circumstances: if the moving party presents newly discovered evidence, if there has been an intervening change in the law, or if the movant can demonstrate that the original decision was based on a manifest error of law or was clearly unjust" (second alteration in original) (quoting Iverson v. City of Bos., 452 F.3d 94, 104 (1st Cir. 2006))).[9]

## B. The Additional-Juror Comment

The district court's response to the additional-juror comment, on the other hand, is a different story. Zimny argues that the district court was required to conduct further investigation after he alerted the court to this evidence. We agree. In the unique circumstances of this case, the additional-juror comment raised a colorable claim of juror misconduct: that, contrary to Juror No. 8's testimony, she discussed the blog post with other jurors.[10]

---

[9] In yet another effort to challenge Juror No. 8's credibility, Zimny argues that the district court failed to realize that still other blog-post comments were similar to Juror No. 8's testimony, suggesting that, contrary to her testimony, she had authored other comments. But Zimny never made this argument to the district court, so we will not entertain its debut on appeal. See United States v. Salley, 651 F.3d 159, 161 n.2 (1st Cir. 2011) (refusing to consider an argument raised for the first time on appeal).

[10] We note that, unlike the other evidence that Zimny presented to the district court after Juror No. 8's testimony, the additional-juror comment was new evidence; it was posted several

First, Zimny has made a colorable showing that the author of this comment was a juror on his trial. Not only did the author of the comment claim to have been a juror, the comment contained details that supported the credibility of that assertion. For example, the comment contained an in-the-know description of Juror No. 8's appearance that was evidently right on the money. See supra note 5. Additionally, the comment accurately recounted that Juror No. 8 did not complete her jury service because of a claimed sickness. The inclusion of these accurate details suggests that the author of this comment was someone who was both in the courtroom during Zimny's trial and intimately familiar with the manner in which it progressed. Furthermore, there is nothing to suggest that the comment was authored by the defendant or anyone acting on his behalf. The comment refers to the post-trial situation involving Juror No. 8 as "comical" and seeks to downplay the effect of Juror No. 8's actions by describing how several jurors told her to "stfu." In sum, aspects of the comment tend to corroborate the author's assertion that he or she was a juror in Zimny's trial.[11]

_____

days after the hearing and Zimny's initial filing in support of his motion for reconsideration. Cf. Allen, 573 F.3d at 53.

    [11] At oral argument, the government asserted that the author of the additional-juror comment could have been anyone who was in attendance in the courtroom during trial, including those in the gallery. Although true, this assertion does not convince us to discount the claims made in the additional-juror comment. This was a situation in which there was already independent reason to

- 21 -

Second, Zimny has shown a colorable claim that serious juror misconduct occurred. Many of the comments on the blog post were highly unfavorable to Zimny. Several of the commentators left vitriolic messages attacking Zimny's truthfulness and character and suggesting that Zimny had engaged in a pattern of similar fraudulent conduct against other Asian families. The blog-post comments were highly prejudicial to Zimny and, if seen by a jury, would likely inflame the jurors' passions. And the additional-juror comment related that Juror No. 8 was "spouting about" — not merely mentioning in passing — the blog "since day one." Moreover, Juror No. 8's alleged references to the blog were troubling enough to cause "[s]everal other jurors" to become "annoyed" and to tell Juror No. 8 "to stfu." The additional-juror comment therefore indicates that Juror No. 8 told her fellow jurors of the blog post and its highly prejudicial comments.

The combination of the comment's credible claim that its author was a juror and the comment's assertion that Juror No. 8 "spout[ed] about" a blog post containing highly prejudicial information to her fellow jurors "since day one" of Zimny's trial convinces us that Zimny has shown a colorable claim of juror misconduct. In these unique circumstances, the additional-juror

_____

suspect possible contamination of the jury. In such circumstances, the mere possibility that the new comment might not, as claimed, have been authored by a juror does not mean, in context, that there existed no new colorable basis to inquire of the jurors.

comment constituted clear, strong evidence that a specific, nonspeculative impropriety occurred that could have been highly prejudicial to Zimny, such that "reasonable grounds for investigation exist[ed]." Connolly, 341 F.3d at 34 (quoting Moon, 718 F.2d at 1234). Thus, the district court was required to investigate this plausible allegation of juror misconduct, see Rodriguez, 675 F.3d at 58, and abused its discretion in failing to conduct a further inquiry once Zimny alerted it to the additional-juror comment. See Paniagua-Ramos, 251 F.3d at 249-50 ("[A] trial court has an unflagging duty adequately to probe a nonfrivolous claim of jury taint . . . ."); Lara-Ramirez, 519 F.3d at 87 (explaining that a district court "judge does not have discretion to refuse to conduct any inquiry at all regarding the magnitude of the taint-producing event and the extent of the resulting prejudice" if confronted with a colorable claim of juror misconduct).

The government disputes this conclusion, arguing instead that, because the comment was posted anonymously, the district court was under no obligation to investigate it at all. In support of this position, the government cites United States v. Caldwell, 776 F.2d 989, 999 (11th Cir. 1985), in which the court stated that "the anonymity of the call [that reported juror misconduct] in our minds simply creates no burden to investigate." We do not agree that, in the circumstances of this case, the anonymous nature of

the additional-juror comment relieved the district court of its obligation to investigate this claim of juror misconduct.

For starters, the additional-juror comment provides an even stronger basis for investigation than Juror No. 8's comments did. Juror No. 8's comments stated that half of the jurors saw Zimny as guilty while the other half did not, but those comments did not explicitly indicate that premature deliberations took place. The additional-juror comment, by contrast, contains an explicit assertion of juror misconduct: that Juror No. 8 was "spouting about" highly prejudicial extraneous information to her fellow jurors "since day one" of trial.

Additionally, Caldwell is distinguishable. For one thing, despite the court's suggestion that the anonymity of the call created no obligation to investigate, the district court actually investigated the claim, questioning the identified juror on two occasions and concluding that she was credible and could remain impartial. Caldwell, 776 F.2d at 994-95. For another, both the source and the nature of the allegation of juror misconduct in Caldwell was markedly different from the additional-juror comment in this case. The anonymous caller in Caldwell did not claim to be a juror and refused to give his name to the judge, and his report of juror misconduct was secondhand: the caller reported that a juror's fiancé told the caller that the fiancé had been informed by the juror that premature deliberations took place.

- 24 -

Id. at 994. In this case, by contrast, the anonymous comment was authored by one who claims to have been a juror on Zimny's trial, the vast majority of the other comments on the blog post were anonymous, the comment relays accurate details supporting the author's assertion of juror status, and the author reports juror misconduct that he or she observed while sitting on the jury. The government has not cited (and we have not found) any federal appellate case supporting the proposition that a district court need not undertake any inquiry of juror misconduct in a case like this — where the defendant has come forward with evidence of juror misconduct that both (1) credibly indicates that its anonymous source was a juror and (2) suggests, based on the source's personal knowledge, that the jury was exposed to highly prejudicial extraneous information — solely because the evidence comes from an anonymous source. To the extent that the language in Caldwell upon which the government relies can be read as supporting this proposition, we decline to follow it.

As a fallback, the government argues that the content of the additional-juror comment supports the district court's refusal to investigate it. Even if Juror No. 8 mentioned the blog post to her fellow jurors, the argument goes, the additional-juror comment establishes that the jurors actually prevented Juror No. 8 from revealing any prejudicial information contained in the blog-post comments; therefore, the government tells us, the district court

was under no duty to investigate the "de minimis" "mention of the blog's existence." We cannot go along with this reasoning on this undeveloped evidentiary record.

The government reads too much into the "stfu" component of the additional-juror comment and not enough into the comment's description of Juror No. 8's misconduct. According to the comment, Juror No. 8 "was spouting about" the blog "since day one." This description of her conduct implies something more than a single fleeting reference to the blog post. Moreover, Juror No. 8's references to the highly prejudicial blog post were pervasive enough that "[s]everal other jurors" became "annoyed" and told Juror No. 8 in no uncertain terms that enough was enough. In the absence of some inquiry into this colorable claim of juror misconduct, we cannot conclude from the basis of the additional-juror comment alone that "the jurors stopped Juror No. 8 from revealing anything" beyond the mere existence of the blog.

For all of these reasons, we hold that, in these circumstances, Zimny's claim of juror misconduct was a colorable one in light of the additional-juror comment — which constituted clear, strong evidence that a serious, specific, and nonspeculative impropriety occurred — and that the district court was therefore required to undertake some investigation of that claim once it was apprised of that evidence. In reaching this conclusion, we emphasize that our holding in this case, like almost

all others involving "claims of jury taint," is "case-specific."
Paniagua-Ramos, 251 F.3d at 250.  We recognize the danger that a criminal defendant or someone acting on a defendant's behalf might author an anonymous posting on the internet while posing as a juror in the hopes of delaying the finality of the conviction, and we by no means require a district court judge to automatically undertake an inquiry every time an anonymous posting authored by someone claiming to be a juror surfaces.[12]   Instead, we hold merely that, in the circumstances of this case, the district court was required to conduct some further inquiry once it was apprised of the additional-juror comment.

## C.   Remedy

Zimny insists that the district court's failure to undertake an adequate investigation of the potential juror misconduct compels us to vacate his conviction and remand for a new trial.  We disagree.

None of the cases Zimny cites compel us to vacate his conviction and remand for a new trial.  For example, in United States v. Rhodes, 556 F.2d 599, 601-02 (1st Cir. 1977), we held

---

[12] A criminal defendant may have a motive to cast doubt upon the integrity of the guilty verdict, and the ability to post content anonymously on the internet creates an avenue for that motive to be expressed.  But this reality alone is insufficient to render allegations of juror misconduct implausible in the circumstances of this case, where the additional-juror comment followed questionable behavior by another juror.

that the district court's inquiry into allegations of juror misconduct was inadequate. Based upon case-specific considerations, we elected to order a new trial. See id. at 602 ("Partly because of the number of possible issues, and partly because so much time has gone by since the discharge of the jury, we feel it would be best for the court to set aside the verdicts and grant defendants a new trial, rather than seeking now to explore the questions of the jurors' exposure to information regarding defendants' additional history."). Nothing we said in Rhodes suggests that a new trial is mandated in these circumstances. See also United States v. Resko, 3 F.3d 684, 694, 695 (3d Cir. 1993) (electing to order new trial, in lieu of remand for further investigation, where district court's inquiry into juror misconduct was inadequate because "there [was] unequivocal proof of jury misconduct" and appellate court had concerns about jurors' faded memories).

In United States v. Gastón-Brito, 64 F.3d 11, 13 (1st Cir. 1995), another case relied upon by Zimny, there was an allegation of an ex parte communication by a government agent with jurors. Such a communication "invoke[s] a more stringent standard," "'is presumptively prejudicial[,]' and obligates the court to 'conduct a sufficient inquiry to determine whether the communication was harmless.'" Id. (quoting United States v. O'Brien, 972 F.2d 12, 14 (1st Cir. 1992)). In this case, however,

the juror-misconduct allegation contained in the additional-juror comment concerns juror exposure to extraneous prejudicial information and not any ex parte communication between a juror and someone associated with the case. Therefore, the presumption of prejudice discussed in Gastón-Brito is simply inapplicable here. See United States v. Bristol-Mártir, 570 F.3d 29, 41-42 n.5 (1st Cir. 2009).

Like Gastón-Brito, Bristol-Mártir, another case cited by Zimny to support his request for a new trial, is distinguishable. In that case, it was established that juror misconduct took place: a juror had conducted internet research on the meaning of words used in a federal statute and, during deliberations, had shared her understanding of these words with the other jurors. Bristol-Mártir, 570 F.3d at 36-37. The district court conducted an investigation, which included meeting "with each juror individually about reading news reports related to the case and about performing outside research," id. at 38, but, "crucially, the district court did not inquire, either in a group setting or on an individual basis, as to whether jury members had been influenced by the errant juror's improper research and presentation," id. at 43. This critical failure led us to conclude that the district court abused its discretion in conducting its inquiry, id. at 43-44, and, without further elaboration, we vacated

the defendants' convictions and remanded for a new trial, <u>id.</u> at 45.

Zimny's case is one step removed from <u>Bristol-Mártir</u>; juror misconduct has not yet been established because the allegation contained in the additional-juror comment was not investigated. On this undeveloped record, we are reluctant to follow the approach that we took in the face of undisputed juror misconduct.

In sum, although the cases Zimny cites support the position that we <u>could</u> vacate his conviction and require a new trial in light of the district court's failure to conduct an investigation into the allegation of juror misconduct contained in the additional-juror comment, they do not require us to follow this course. Moreover, in these circumstances, we possess the authority to remand for further investigation instead of ordering a new trial. <u>See, e.g.</u>, <u>United States</u> v. <u>Vitale</u>, 459 F.3d 190, 199-200 (2d Cir. 2006); <u>United States</u> v. <u>Brande</u>, 329 F.3d 1173, 1177 (9th Cir. 2003); <u>United States</u> v. <u>Tucker</u>, 137 F.3d 1016, 1031-33 (8th Cir. 1998); <u>United States</u> v. <u>Brantley</u>, 733 F.2d 1429, 1440-41 (11th Cir. 1984); <u>see also</u> <u>United States</u> v. <u>Sandalis</u>, 14 F. App'x 287, 288, 291 & n.7 (4th Cir. 2001).[13]

---

[13] In an analogous context, we employed this approach in <u>Villar</u>, 586 F.3d at 78-79, 87, which involved an allegation of juror misconduct that the district court did not investigate based on its mistaken belief that it completely lacked authority, by

In this case, a remand for further investigation is preferable to vacating Zimny's conviction outright and ordering a new trial. For one thing, because the additional-juror comment was not investigated by the district court, we simply do not know whether its assertions of juror misconduct are true. We are unwilling to disturb Zimny's conviction on this undeveloped evidentiary record when an adequate inquiry might reveal that the alleged juror misconduct did not occur in the first place. For another, while we acknowledge the potential that the jurors' memories may have faded in the time since they returned their verdict, see Resko, 3 F.3d at 695; Rhodes, 556 F.2d at 602, this possibility does not warrant declaring a new trial at this juncture. Given the combination of (1) the highly prejudicial nature of the blog-post comments, (2) that Juror No. 8 was

---

virtue of the prohibition contained in Federal Rule of Evidence 606(b), from conducting any inquiry into a juror's comments made during deliberations that indicated ethnic bias. Because the district court had indicated its desire to conduct an inquiry if it was permitted, we remanded the case for the district court to undertake that inquiry if it still desired to do so. Id. at 79, 87-88; cf. United States v. Rowe, 144 F.3d 15, 23-24 (1st Cir. 1998) (remanding "for further argument and record development" where, after jury returned guilty verdict but before sentencing, district court received letter from juror but refused to make it part of record or disclose its contents to attorneys; "if, on further reflection, the court sees compelling factual and/or legal reasons which both outweigh the very strong interests [the defendant] has in reviewing the letter and render inadequate the measures at the court's disposal for ensuring jury and juror confidentiality, the court should state those reasons with particularity to facilitate any further review we may be called upon to conduct").

"spouting about" the blog "since day one," and (3) that "[s]everal other jurors" were so "annoyed" by Juror No. 8's conduct that they told her to "stfu," it is not at all clear to us that a juror would soon forget witnessing these strange events unfold in such a tense environment. In any event, the district court's inquiry will readily reveal whether memories have faded, and, if they have, the district court can then determine if a new trial is warranted, see Rhodes, 556 F.2d at 602. But we will not presume on this record that further investigation will be fruitless.

## Conclusion

We remand with instructions that the district court conduct an investigation into the juror-misconduct allegations raised in the additional-juror comment. Specifically, the district court must ascertain "whether [this alleged] misconduct actually occurred and[,] if so, determine whether it was prejudicial." Rodriguez, 675 F.3d at 58. We emphasize the district court's discretion in determining "the scope of the resulting inquiry and the mode and manner in which it will be conducted." Paniagua-Ramos, 251 F.3d at 250; see also United States v. Ortiz-Arrigoitia, 996 F.2d 436, 443 (1st Cir. 1993) ("The trial judge is not . . . shackled to a rigid and unyielding set [of] rules and procedures that compel any particular form or scope of inquiry."); Boylan, 898 F.2d at 258 ("So long as the district judge erects, and employs, a suitable framework for investigating

the allegation and gauging its effects, and thereafter spells out [her] findings with adequate specificity to permit informed appellate review, [the court's] 'determination . . . deserves great respect [and] . . . should not be disturbed in the absence of a patent abuse of discretion.'" (third alteration in original) (citation omitted) (quoting United States v. Hunnewell, 891 F.2d 955, 961 (1st Cir. 1989))); cf. Rogers, 121 F.3d at 15, 17 (finding no abuse of discretion with respect to district court's inquiry of colorable claim of juror misconduct that surfaced after trial where court questioned two jurors most closely involved and determined that, although juror misconduct occurred, it was not prejudicial to defendant).  After conducting this inquiry, the district court should next decide whether the information unearthed in the investigation warrants granting Zimny a new trial and, in doing so, should indicate its findings and rationale supporting that conclusion "with adequate specificity to permit informed appellate review."  Boylan, 898 F.2d at 258.

In the meantime, we retain jurisdiction over the case and the remaining issues that Zimny has raised on appeal.  See Brande, 329 F.3d at 1178 (remanding case to district court for further investigation of juror-misconduct allegation while retaining jurisdiction over case and remaining issues).  In the event that the district court orders a new trial and the government chooses to appeal from that order, see 18 U.S.C. § 3731, we will

- 33 -

consolidate the government's appeal with this case and proceed accordingly. If, on the other hand, the district court still believes that a new trial is not warranted, it shall transmit a copy of its written findings and conclusions to the Clerk of this court. Counsel for both parties shall notify this court after the district court reaches its conclusions, at which time we will issue any orders that we deem appropriate.

**REMANDED.**