# United States Court of Appeals
## For the First Circuit

---

Nos. 99-1568
     00-1764

UNITED STATES OF AMERICA,

Appellee,

v.

DANIEL PANIAGUA-RAMOS,

Defendant, Appellant.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

---

Before

Selya, Circuit Judge,

Coffin, Senior Circuit Judge,

and Lynch, Circuit Judge.

---

José R. Franco, with whom David W. Roman and Brown & Ubarri were on brief, for appellant.
Nelson Pérez-Sosa, Assistant United States Attorney, with whom Guillermo Gil, United States Attorney, and Jorge E. Vega-Pacheco, Assistant United States Attorney, were on brief, for appellee.

May 30, 2001

**SELYA, Circuit Judge.** Defendant-appellant Daniel Paniagua-Ramos (Paniagua) beseeches us to set aside his conviction for conspiracy to possess, with intent to distribute, multi-kilogram quantities of cocaine. See 21 U.S.C. §§ 841(a)(1), 846. Paniagua rests his entreaty on claims of instructional error and jury taint.[1] Finding neither claim persuasive, we affirm the judgment below.

## I

The details of the alleged conspiracy are of relatively little import to the issues on appeal, and it would be pleonastic to rehearse them here. It suffices to say that the government adduced evidence that Paniagua, acting in concert with Juan Cubilette-Baez and Rafael del Rosario-Sánchez (del Rosario), orchestrated a scheme to transport large amounts of

---

[1] In his opening brief, Paniagua also mounted a challenge under the banner of Apprendi v. New Jersey, 120 S. Ct. 2348, 2062-63 (2000) (establishing, as a constitutional matter, that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt"). Following our explication of Apprendi in United States v. Robinson, 241 F.3d 115, 119 (1st Cir. 2001), Paniagua withdrew this claim.

-2-

cocaine from San Juan to New York City.  According to the government's proof, the scheme had mixed results.  The conspirators' first shipment (100 kilograms) went astray.  Their second shipment (200 kilograms) was successful and Cubilette-Baez received the contraband in New York.  Before the third shipment (scheduled to comprise 200 kilograms) left San Juan, the authorities intervened.

Paniagua soon was arrested, indicted, and tried.  His quondam accomplice, del Rosario, became a key witness against him — a witness whose testimony constituted the cornerstone of the government's case.

The matter was tried twice.  On the first occasion, the jury found Paniagua guilty on the conspiracy count but acquitted him on a related charge.  The trial judge voided the conviction, however, based on what he retrospectively found to be prejudicial error in the jury instructions.  The government unsuccessfully appealed the order granting a new trial.  See United States v. Paniagua-Ramos, 135 F.3d 193 (1st Cir. 1998).

Upon retrial, the jury returned a verdict on August 25, 1998.  It again found Paniagua guilty of conspiracy.

On March 10, 1999, the court sentenced Paniagua to serve a 235-month incarcerative term.  Paniagua appealed.  He later moved for a new trial on the ground of jury taint.  When

the district court rebuffed this effort, a second appeal ensued.[2]
By order dated June 15, 2000, we consolidated the two appeals
for briefing, argument, and adjudication.

## II

Paniagua's first claim of error involves the lower
court's jury instructions.  He calumnizes the testimony of the
turncoat witness, del Rosario, and argues that the court erred
in failing sufficiently to emphasize that the jurors should have
received this testimony with caution and scrutinized it with
care.  He adds that the court compounded this error by failing
to instruct the jurors that they should not convict on the
unsupported testimony of an accomplice absent a belief "beyond
a reasonable doubt that the accomplice is telling the truth."
United States v. Dailey, 759 F.2d 192, 200 n.8 (1st Cir. 1985).
This claim lacks force.

We do not gainsay the obvious:  courts long have
recognized the special pitfalls that accompany accomplice
testimony.  In an appropriate case, a criminal defendant is

---

[2]In United States v. Josleyn, 206 F.3d 144, 150-51 (1st Cir.
2000), we left open the question of whether a defendant in a
criminal case needs to file a separate notice of appeal from an
order denying a post-sentence motion for new trial (or,
conversely, whether the original notice of appeal from the
judgment of conviction suffices to bring that order before the
appellate court).  This case does not require us to answer that
question.

entitled, upon timely request, to an instruction that calls the jury's attention to these dangers.  E.g., United States v. Pelletier, 845 F.2d 1126, 1129 (1st Cir. 1988).  There are, however, no magic words that must be spoken in this regard.

This is as it should be.  The primary function of a trial court's instructions is to create a roadmap for the jurors, limning those legal rules that they must follow in finding the facts and determining the issues in a given case. For the most part, the law provides no set formulae for converting these legal rules into lay language — and the choice of what words are to be spoken belongs, within wide margins, to the trial judge.  See United States v. Houlihan, 92 F.3d 1271, 1299 n.31 (1st Cir. 1996) (remarking the trial court's "broad discretion to formulate jury instructions as it sees fit"); United States v. Nivica, 887 F.2d 1110, 1124 (1st Cir. 1989) (noting that the trial judge need not parrot proffered instructions).

It also bears mention that the formulation of jury instructions in a criminal case is an interactive process.  The trial judge must, of course, pull the laboring oar — but the parties have a corollary responsibility seasonably to apprise the judge about what they think the jury should or should not be told.  See Fed. R. Crim. P. 30 (requiring parties to object to

-5-

jury instructions before the jury retires, stating specifically the portion of the instructions to which each objection is addressed and the ground for the objection). Paniagua interposed no contemporaneous objection to the district court's jury instructions, and it is settled beyond peradventure that a party's failure to object to the charge in strict conformity with the prerequisites of Rule 30 forfeits most instructional errors. See United States v. Richardson, 14 F.3d 666, 670-71 (1st Cir. 1994); United States v. Weston, 960 F.2d 212, 216 (1st Cir. 1992).

We say "most," rather than "all," because there is a carefully circumscribed exception for plain errors. But the plain error hurdle, high in all events, nowhere looms larger than in the context of alleged instructional errors. See United States v. McGill, 952 F.2d 16, 17 (1st Cir. 1991); see also United States v. Taylor, 54 F.3d 967, 976 (1st Cir. 1995) ("If no timely objection has been advanced . . . even an improper instruction rarely will justify the reversal of a criminal conviction.") (citation omitted). To vault this hurdle, a defendant must make four showings. First, he must show that an error occurred. Second, he must show that the error was clear or obvious. Third, he must show that the error affected his substantial rights. Fourth, he must show that the error so

seriously impaired the fairness, integrity, or public reputation of the proceedings as to threaten a miscarriage of justice. <u>Johnson</u> v. <u>United States</u>, 520 U.S. 461, 466-67 (1997); <u>United States</u> v. <u>Olano</u>, 507 U.S. 725, 732 (1993); <u>United States</u> v. <u>Brown</u>, 235 F.3d 2, 4 (1st Cir. 2000). Paniagua's claim of error cannot surmount these barriers.

We agree with Paniagua that, despite the height of the hurdle, plain error is theoretically possible with respect to an omitted jury instruction. If, say, a trial court fails to instruct a criminal jury on a basic point like the government's burden of proof or the presumption of the defendant's innocence, the lack of a contemporaneous objection would not foreclose searching appellate review. <u>E.g.</u>, <u>United States</u> v. <u>Howard</u>, 506 F.2d 1131, 1132-34 (2d Cir. 1974) (finding plain error where the jury was not instructed as to the elements of the offense of conviction). Here, however, there is no such glaring omission. The district court correctly (and emphatically) instructed the jury about the government's burden of proof. The court also instructed the jurors at considerable length about their collective responsibility for evaluating the credibility of witnesses. To cap matters, the court gave a specific instruction about accomplice testimony, <u>viz</u>:

> You have heard testimony of the codefendant Rafael del Rosario. This

> witness has a cooperation agreement with the government. The testimony of Rafael del Rosario was given in order for him to hopefully receive a reduction in sentence on act of his cooperation.
>
> In . . . evaluating testimony of a cooperating witness, you should consider whether that testimony may have been influenced by the government's promises and you should consider that testimony with greater caution than that of ordinary witnesses. Cooperation agreements are lawful. The law only requires that you consider testimony given under those circumstances with greater caution than that of ordinary witnesses.

We do not suggest that this instruction is either letter perfect or insusceptible to any improvement. But reading it against the backdrop of the charge as a whole, see United States v. Cintolo, 818 F.2d 980, 1003 (1st Cir. 1987), we think that the instruction constitutes a fair statement of the applicable law concerning accomplice testimony. In the absence of a contemporaneous objection, no more was exigible. See United States v. Fernandez, 145 F.3d 59, 62 (1st Cir. 1998) (finding no plain error even though district court neglected "to give an unrequested cautionary instruction [and] the government's case largely depend[ed] on uncorroborated informant or accomplice testimony"); United States v. Martin, 815 F.2d 818, 824 (1st Cir. 1987) (finding no plain error when district court failed to give an explicit accomplice instruction, but defendant did not

register a contemporaneous objection); see also Fed. R. Crim. P. 52(b) (directing courts, in substance, to ignore unpreserved errors not adversely "affecting substantial rights" of defendants).

Notwithstanding these authorities, Paniagua posits that more is required here because del Rosario's testimony was internally inconsistent and largely incredible. See Fernandez, 145 F.3d at 62-63 (leaving open this possibility); United States v. House, 471 F.2d 886, 888 (1st Cir. 1973) (similar). We need not probe this point too deeply for Paniagua's premise is woven out of whole cloth. He has identified no portion of del Rosario's testimony about the drug-trafficking operation that is either demonstrably false, internally inconsistent, or inherently incredible. Perhaps more importantly, our independent examination of the record reveals no flaw of this magnitude. The Fernandez exception is, therefore, inapposite.

By like token, the Fifth Circuit's decision in United States v. Jones, 673 F.2d 115 (5th Cir. 1982), hawked by Paniagua in his brief and at oral argument, does not assist his cause. There, as here, the appellant contended "that the district court committed plain error by failing to give a cautionary instruction (although not requested to do so) against conviction upon the uncorroborated testimony of an alleged

-9-

accomplice, who was a cooperating government witness."  <u>Id.</u> at 117.  Jones argued, as does Paniagua, that whenever a conviction is based upon an accomplice's testimony and that testimony is uncorroborated or the evidence as to guilt is debatable, plain error "invariably results, unless the trial court (even in the absence of request) specially instructs the jury to receive such accomplice testimony with caution and to require corroboration of it."  <u>Id.</u> at 118.  The court of appeals rejected this strait-jacketed reading of the law, remarking that "in the ordinary course of criminal trial, one would expect experienced counsel to request such an [accomplice] instruction should it be thought desirable to have this express instruction to alert the jury to the potential unreliability of the accomplice . . . testimony." <u>Id.</u>  Placing the burden elsewhere, the court stated, would "permit counsel, by knowing inaction, to trap a trial court into reversible omission of instruction."  <u>Id.</u> at 119.  As a result, "the failure to give an instruction in the absence of request for it may amount to plain error only in egregious instances." <u>Id.</u>  Since the circumstances here hardly are egregious, <u>Jones</u> provides no support for Paniagua's plaint.

Paniagua's rejoinder of last resort is that the belatedly challenged instruction denied him a fair trial because it ignored what he terms an "established safeguard," namely, a

direction to the jurors that they could not convict unless they "believe beyond a reasonable doubt that [the testifying] accomplice is telling the truth." Paniagua draws the quoted language verbatim from a footnote in our opinion in Dailey, 759 F.2d at 200 n.8. Although the quotation is accurate, casting the direction as an immutable obligation wrests the words from their contextual moorings and distorts the Dailey court's meaning.

In Dailey, the government appealed a pretrial order barring it from using accomplice testimony at Dailey's trial. 759 F.2d at 193. The district court issued the bar order because it believed that the accomplices' plea agreements were so likely to incite perjurious testimony that allowing the accomplices to appear as witnesses would violate Dailey's right to a fair trial. Id. at 194. We reversed this order, holding that Dailey's accomplices should be permitted to testify, subject to "standard procedural safeguards." Id. at 200. We recounted certain of those safeguards (e.g., "[t]he [plea] agreements should be read to the jury and made available during its deliberations; defense counsel [should be allowed to] cross-examine the accomplices at length about the agreements; and the jury should be given the standard cautionary instruction concerning the testimony of accomplices and a special cautionary

instruction concerning the nature of each accomplice's contingent agreement and the risk that it creates, particularly in instances where the accomplice's testimony cannot be corroborated"). Id. Along the way, we quoted extensively from jury instructions actually used by a different district judge in a companion case and concluded that those instructions "adequately admonishe[d] the jury to weigh [the accomplices'] testimony with the greatest of care." Id. at 200 n.8. The phraseology upon which Paniagua relies is part of this rendition.

Read in context, Dailey makes clear that the court considered the quoted instructions to be adequate. The court did not, however, intimate that those precise instructions were obligatory. Indeed, in many cases, the Dailey language will not be appropriate. It is bedrock principle that, in the ordinary case, a jury need not believe every government witness beyond a reasonable doubt in order to conclude that the defendant is guilty beyond a reasonable doubt — and Dailey did not venture to alter that principle.[3] Nor did Dailey purport to constrain the usual rule that a trial judge has considerable leeway in

_____

[3]Even so, where the accomplice's uncorroborated testimony is the only evidence of guilt, an admonition that the testimony must be believed beyond a reasonable doubt, if requested, would be advisable to guide the jury's deliberations.

-12-

choosing the language that will best enable him or her to enlighten the jury as to a particular point. Houlihan, 92 F.3d at 1299 n.31; Nivica, 887 F.2d at 1124. Accordingly, we reject Paniagua's effort to convert an example into a mandate.

To sum up, the court's charge in this case adequately covered the subject of accomplice testimony. Although there were differences between the language used by the court and the language that Paniagua now says he would have preferred, we fail to see how those differences depart in a material way from standards established in our precedents. We conclude, therefore, that the absence of a contemporaneous objection dooms Paniagua's argument. After all, the challenged instructions contained no clear or obvious error and inflicted no blow to Paniagua's substantial rights. In these circumstances, permitting the conviction to stand does not come close to constituting a miscarriage of justice.

### III

Paniagua's remaining assignment of error focuses on the denial of his motion for new trial. He maintains that he raised a colorable claim of jury taint; that the lower court's inquiry into the issue was superficial; and that he was entitled, at the very least, to a more rigorous investigation. We do not agree.

The relevant facts are as follows.  On August 4, 1999 — nearly a year after the jury verdict and nearly five months after the imposition of sentence — Paniagua moved for a new trial.  See Fed. R. Crim. P. 33.  His motion incorporated, and relied upon, a sworn statement from Paniagua's sister, Maria Antonina Paniagua-Ramos.  The statement, signed on July 30, 1999, related that the affiant had attended the trial throughout; that she had testified for the defense; and that she had become thoroughly familiar with the jurors and the prosecutors.  The affiant went on to allege that, near the end of the trial, she observed two female jurors chatting with former Assistant United States Attorney José A. Quiles in the cafeteria area of the courthouse; that the trio separated, but one of the women soon returned and handed Quiles a document (perhaps a notebook); and that Quiles pocketed the document. Based on this alleged ex parte communication, Paniagua requested a new trial.[4]

The United States objected to the motion and denied the factual averments on which the motion was predicated.  The district court ordered both sides to file memoranda explicating what, if anything, Quiles may have said or done, and how (if at

_____

[4]Paniagua nowhere credibly explains why the affiant's observations, allegedly made on August 24, 1998, were not reported to the court until almost a year later.

-14-

all) his actions may have tainted the jury. In responding, the government filed, inter alia, a declaration in which Quiles (who had served as the lead prosecutor during the first trial and the ensuing appeal) stated, under the penalties of perjury, that he had no role in the second trial and no contact with either the case agent or the prosecutor. He "categorically den[ied] the statements made by Mrs. Maria Antonina Paniagua-Ramos." He concluded his declaration by professing ignorance as to the identity of the persons who served as jurors in the second trial and affirming that he had "never delivered or received any documents from any jurors."

After reviewing the parties' submissions, the court reassembled the discharged jury and convened an evidentiary hearing. The judge questioned each former juror individually, under oath, and in the presence of both counsel. The judge asked each one, in substance, whether he or she had had any contact with Quiles, and whether he or she knew of any dealings between Quiles and any other member of the venire.[5] Without

_____

[5]A few examples illustrate the tenor of the inquiry. The court queried one juror as to whether she "remember[ed] whether any juror ever talked to a prosecutor, a male prosecutor?" The court asked another, "Do you remember whether ever, at any point in time during that trial when you were not actually in the courtroom, that anybody — . . . could have been an assistant U.S. attorney by the name of José Quiles — ever approached you or any other member of the jury to discuss anything about the case?"

exception, the former jurors answered these inquiries in the negative. After hearing arguments of counsel, the district court took the matter under advisement and, in due course, denied Paniagua's motion.

We review a district court's denial of a motion for new trial for abuse of discretion. United States v. Huddleston, 194 F.3d 214, 218 (1st Cir. 1999). Similarly, we review claims that a trial court failed to conduct an appropriate inquiry into allegations of jury taint for abuse of discretion. United States v. Boylan, 898 F.2d 230, 258 (1st Cir. 1990). The touchstone is reasonableness: did the trial court fashion, and then even-handedly implement, a sensible procedure reasonably calculated to determine whether something untoward had occurred? See id. We measure Paniagua's asseveration against this benchmark.

We begin with first principles:

> The right to trial by jury in a criminal case is an important feature of the justice system. In turn, the value of the right consists principally in the neutrality of the venire. All would agree that an impartial jury is an integral component of a fair trial. To preserve the integrity of the process, trial courts must jealously safeguard jurors' impartiality.

Neron v. Tierney, 841 F.2d 1197, 1200-01 (1st Cir. 1988) (citation omitted). A principal purpose for such safeguards is

-16-

to insulate jurors from improper ex parte contacts. The proposition that private communications between jurors and prosecutors during the course of a criminal trial are absolutely forbidden is so elementary as to require no citation of authority. This does not mean, however, that every assertion of forbidden contact must be accepted as gospel. Experience teaches that such assertions are more easily made than proven. Consequently, any such assertion must be tested.

Trial courts have considerable latitude in determining how best to evaluate such assertions and thus assure jury impartiality in particular cases. See id. at 1201 (explaining that "within a given situation, a broad range of alternatives, each different from the others, may suffice to alleviate due process concerns" in respect to claims of jury taint). In other words, while a trial court has an unflagging duty adequately to probe a nonfrivolous claim of jury taint, see Smith v. Phillips, 455 U.S. 209, 215 (1982); Remmer v. United States, 347 U.S. 227, 229-30 (1954), the court has wide discretion to determine the scope of the resulting inquiry and the mode and manner in which it will be conducted.

Here, the measures taken by the district court in addressing Paniagua's claim of jury taint assured that the possibility of spoliation was satisfactorily explored and the

record adequately developed. Despite the tardiness of Paniagua's proffer, see supra note 4, the district court took his allegations seriously. The court ordered both sides to submit explanatory memoranda. After receiving these responses, the court took further steps: it reassembled the jury and conducted an individualized voir dire, permitting counsel for both sides to audit the jury interviews and make suggestions. The court then found, based on the developed facts, that the events described by Paniagua's sister had not occurred.

This balanced, well-thought-out process easily passes muster. While the court perhaps could have devised some other or different plan to test the credibility of the charge (say, ordering Quiles and Paniagua's sister to testify in person and to undergo cross-examination), our case law makes clear that claims of jury taint are almost always case-specific. Thus, the trial court — which is likely to have a superior "feel" for the nuances of the case — ought to be accorded considerable deference in fashioning procedures to deal with such matters. Neron, 841 F.2d at 1201. Accordingly, we decline Paniagua's invitation to second-guess the lower court's judgment as to what

methodology was best calculated to get at the truth in this instance.[6]

Paniagua has a fallback position. Leaving the district court's methodology to one side, he says that the court clearly erred in rejecting Maria Antonina Paniagua-Ramos's specific and unambiguous affidavit. But a judge is not required to accept a fact as true simply because a witness swears to it. See, e.g., United States v. Tipton, 3 F.3d 1119, 1122 (7th Cir. 1993). In this instance, the affiant's statement was rendered suspect both by her evident partiality and by the timing of the submission. It was flatly contradicted by Quiles's declaration. To cinch matters, the juror interviews belied the affiant's accusations. Consequently, the court's finding that no compromising incident occurred is fully supportable.

The short of it is that Paniagua failed, despite having been given a fair opportunity, to establish the bona fides of his claim of jury taint. We hold, therefore, that the district court did not abuse its discretion either in developing a format

---

[6]We reject Paniagua's contention that the trial court's inquiry was insufficient in light of Remmer, 347 U.S. 227. Remmer involved a situation in which the district court relied on the Federal Bureau of Investigation to check out an instance of possible jury taint, determined that no taint existed based solely on the results of that investigation, and excluded the defendant from any role in the inquiry. See id. at 228. That is a far cry from what transpired here.

-19-

for testing that claim or in denying Paniagua's second motion for a new trial.

## IV

We need go no further. For aught that appears, Paniagua was tried and convicted by a properly instructed jury, unspoiled by prosecutorial misconduct. His conviction and sentence must, therefore, be

**Affirmed**.