# United States Court of Appeals
## For the First Circuit

Nos. 19-1605, 19-1632

UNITED STATES OF AMERICA,

Appellee,

v.

MALCOLM A. FRENCH and RODNEY RUSSELL,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Lynch, Kayatta, Barron,
Circuit Judges.

Jamesa J. Drake, Thomas F. Hallett, Hallett, Whipple & Weyrens, PA, and Drake Law, LLC on brief for appellant Malcolm French.
William S. Maddox on brief for appellant Rodney Russell.
Halsey B. Frank, United States Attorney, and Julia M. Lipez, Assistant United States Attorney, on brief for appellee.

October 7, 2020

**KAYATTA**, **Circuit Judge**.     Malcolm French and Rodney Russell sought a new trial after a jury found them guilty of charges arising out of a large-scale marijuana-farming operation. They argued that one juror had lied in filling out the written questionnaire given to prospective jurors prior to trial. Agreeing in part, we vacated the district court's order denying their request for a new trial and remanded the case for further proceedings to investigate the alleged juror misconduct. United States v. French, 904 F.3d 111, 114, 125 (1st Cir. 2018). Following further proceedings on remand, the district court again denied the motion for a new trial. French and Russell now appeal a second time, claiming that the district court improperly exercised its discretion in fashioning a procedure to investigate the defendants' claims and in concluding that a new trial was not warranted. For the following reasons, we reject the appeal and affirm the district court's order dismissing the defendants' motion for a new trial.

**I.**

**A.**

French and Russell were charged after substantial marijuana-cultivation sites were found on French's property in September 2009. As we recounted in the defendants' first appeal, French controlled some 80,0000 acres of land in Washington County, Maine, and employed Russell as an office manager for his logging

business.  <u>French</u>, 904 F.3d at 114.  After an investigation by Maine law enforcement, a grand jury indicted both defendants for conspiring to manufacture marijuana, manufacturing marijuana, maintaining drug-involved premises, harboring illegal aliens, and conspiring to distribute and possess with intent to distribute marijuana.  <u>Id.</u>  A jury trial ensued.  Numerous eyewitnesses testified as to French and Russell's involvement in marijuana production, while both defendants testified and denied culpability.  After the jury convicted French and Russell on all counts, the district court sentenced French to 175 months' imprisonment and Russell to 151 months' imprisonment.  <u>Id.</u>

Soon after sentencing, defense counsel learned that Juror 86 -- who sat on the jury in French and Russell's trial -- has a son who was a small-time marijuana dealer.  <u>Id.</u> at 114-15. Upon receipt of this information, French's counsel investigated and learned that the older of Juror 86's two sons had been convicted of marijuana and other drug-related offenses between 2002 and 2014.  Counsel also learned that Juror 86 had visited her older son in jail on one occasion and had paid legal fees arising out of his offenses on several others.  <u>Id.</u> at 115.

Juror 86 had not disclosed this information about her son's involvement in the criminal legal system on a questionnaire that the Clerk's Office distributed to her when she was called for

jury duty in October 2013, prior to jury selection. Question 3 of the questionnaire read as follows:

> a.) Please describe briefly any court matter in which you or a close family member were involved as a plaintiff, defendant, witness, complaining witness or a victim. [Prospective jurors were given space to write]
> b.) Was the outcome satisfactory to you? [Prospective jurors were given "yes" and "no" check boxes here]
> c.) If no, please explain. [Prospective jurors were given space to write]

Id. (alterations in original). Juror 86 had written only "n/a" after part (a) and left parts (b) and (c) blank. She also had not completed the second page of the questionnaire, which contained six additional prompts on other matters and directed prospective jurors to sign and declare under penalty of perjury that they had answered all the questions truthfully and completely. Id.

Nor had Juror 86 supplied the information about her son's criminal history in response to several questions posed to prospective jurors by the magistrate judge during oral voir dire in January 2014, including the following question:

> Now, as you've heard for a couple hours now this morning, this is a case about marijuana, which is a controlled substance under federal law. Is there anyone on the jury panel who themselves personally or a close family member has had any experiences involving controlled substances, illegal drugs, specifically marijuana, that would affect your ability to be impartial?
> And by any experiences, I'm talking about whether you or a close family member have been involved in a situation involving substance

abuse or involving treatment that -- maybe professionally treating that condition, or being the victim of a crime involving those substances, or being the perpetrator of a crime where someone alleged those substances were involved. Any . . . experiences regarding illegal drugs, and specifically marijuana, but any illegal drug, controlled substance under federal law, is there anyone who's had that sort of experience?

Id. (alteration in original).[1]

In first moving for a new trial in the spring of 2016, the defendants argued that Juror 86's responses to the questionnaire and her lack of response to the oral voir dire questions were dishonest. Id. at 116, 120. They maintained that if Juror 86 had answered these questions honestly, the court likely would have stricken her for cause. In addition to seeking a new trial, the defendants requested an evidentiary hearing to question Juror 86 about her responses. Id. at 116. The district court denied the defendants' motion for a new trial in November of 2016,

---

[1] Juror 86 also did not respond to another question posed by the magistrate judge:
Is there anyone here who knows of any other reason, some question I haven't asked or something that's been sitting there troubling you, why hasn't she asked me about this, those attorneys, those people should know about this fact and it might interfere with me being a fair and impartial juror or it might appear that it would interfere, is there any other fact that you feel would affect in any way your ability to be a fair and impartial juror?
French, 904 F.3d at 115.

finding Juror 86's answers, or lack thereof, insufficient to compel a new trial or an evidentiary hearing. Order Denying Motion for New Trial at 24–25, 43–44, United States v. French, No. 12-cr-00160-JAW (D. Me. Nov. 16, 2016), ECF No. 734.

On appeal, we found that the allegations of Juror 86's bias presented a "colorable or plausible" claim of the type of juror misconduct that might require a new trial. French, 904 F.3d at 120. However, because the record as it then stood did not indicate why Juror 86 answered as she did, we could not definitively determine whether she was unduly biased. Id. at 118. We therefore vacated the district court's denial of the defendants' motion and remanded for further proceedings on the motion for a new trial. Id. at 125.

**B.**

On remand, the district court held an evidentiary hearing to resolve the two questions on which the new-trial motion depends: "(1) did Juror 86 fail to honestly answer a material question; and (2) would a correct response have provided a basis for a challenge for cause"? Prior to the hearing, the district court twice met with counsel to discuss what procedures to adopt to investigate the allegations of Juror 86's bias. The parties shared views on issues such as how to approach Juror 86, the likelihood that she would invoke her Fifth Amendment rights, whether the Court should appoint counsel to represent her, and

- 6 -

whether the Court or counsel should do the questioning at the hearing. Over the defendants' objections, the district court appointed the Federal Defender for the District of Maine, Attorney David Beneman, to represent Juror 86 at the evidentiary hearing. The district court also decided that, contrary to the government's preference, it would not ask Juror 86 questions from the bench during the hearing. Instead, the district court ruled that Attorney Beneman would perform a direct examination of Juror 86, followed by cross-examination by the government and counsel for the defendants, notwithstanding the defendants' argument that they should be allowed to question Juror 86 first because they had the burden of proof.

During the evidentiary hearing held on February 1, 2019, the parties stipulated to the relevant criminal record of Juror 86's older son. Most notably for our purposes, that record included: a 2002 state-court charge for unlawful furnishing of marijuana (which led to a misdemeanor conviction for unlawful possession of marijuana); a 2005 state-court charge for unlawful furnishing of cocaine (which led to a misdemeanor conviction for possession of cocaine); and a 2011 state-court misdemeanor conviction for unlawful possession of marijuana. Counsel further stipulated that when prospective jurors are contacted by the Clerk's Office and complete the relevant jury selection questionnaires, they do not know whether they are being called for

a civil case or a criminal case. Several exhibits were admitted, including copies of three personal checks made out by Juror 86 in 2010 to a lawyer in relation to services provided to her older son; a record that Juror 86 visited her older son at the Kennebec County Jail in October 2003; and a petition referencing a juvenile proceeding in which Juror 86's older son was charged with theft and forgery in 2001.

The evidentiary hearing lasted for approximately two and a half hours. On direct examination, Juror 86 testified that she did not recall filling out the questionnaire in the fall of 2013 and that looking at the forms did not refresh her memory. Juror 86 nonetheless agreed that the handwriting was hers. Regarding Question 3(a), which asked her to describe "any court matter in which you or a close family member were involved," she said that her answer ("n/a") was correct because it meant "not applicable." She nevertheless agreed that she had herself gone to court on two occasions: once as a witness in a matter concerning her sister's negligent parenting, and once when she was divorced. She further testified that her current husband had also gone to court for a divorce with a prior spouse and for an operating under the influence charge. As for her two sons, Juror 86 testified that her younger son had been to court on charges for speeding, possession of tobacco by a minor, and possession of a "small amount of pot," and she believed that she had accompanied him on some or

all occasions. Juror 86 also admitted that her older son had gone to court, that she had visited him at Kennebec County Jail, and that she had written checks to a lawyer to pay for his legal services. However, she indicated that she did not specifically know why her older son had hired a lawyer or what he was charged with.

On cross-examination by defense counsel, Juror 86 maintained that she did not include this information about her family members' involvement with the legal system on the questionnaire because she "did not think it was relevant." Despite visiting her older son in jail, Juror 86 stated that she had not known the nature of the charges against him and only learned that they had involved marijuana during conversations with Attorney Beneman in advance of the evidentiary hearing. She explained that she "remember[ed] he was pulled over," but that "he never talked to [her] about it." When prompted about her presence at a juvenile proceeding, Juror 86 recalled that she reported one of her sons to the police after he forged one of her checks and stole from her in 2001, but that she did not recall what legal proceedings resulted.

With respect to the oral questions posed by the magistrate judge as part of the voir dire process exploring matters "that would affect [potential jurors'] ability to be impartial," Juror 86 testified on direct examination that she did

not remember answering the question of whether she or a close family member had had any experiences with controlled substances, particularly marijuana.  She further stated that she thought that the question "did not pertain to [her]" because she "stay[s] neutral" and "do[esn't] form judgments prior to knowing the full story."  She added that her sons' involvement in matters concerning marijuana would not have affected her ability to be impartial.  As to the question posed by the magistrate judge of whether anyone on the jury panel had strong beliefs about the legalization of marijuana that would interfere with the juror's ability to be fair and impartial, Juror 86 did not recall responding, but suggested she would not have responded because she "did not have an opinion either way" that would have impeded her ability to be impartial.  As to a final question posed by the magistrate judge -- whether there was anything that would have interfered with the prospective juror's ability to be a fair and impartial juror in the case -- Juror 86 indicated that she felt that she could be fair and impartial, and that she still believed that to be the case.

On cross-examination by the government, Juror 86 denied that she had sought to hide or provide false information in her answers to Question 3(a) and the questions posed by the magistrate judge.  She indicated that she had only a limited knowledge of her sons' interactions with the legal system and stated that she did not have a strong desire to be either on or off a jury or any bias

or animosity against people accused of drug crimes, including people accused of growing marijuana.[2]

Following the evidentiary hearing, French and Russell filed renewed motions for a new trial. The district court denied the motions. Despite finding that Juror 86 "failed to honestly answer a material question on voir dire" by not disclosing numerous court proceedings involving herself and her close family members, including several involving controlled substances, the court concluded that Juror 86 would have been able to separate her emotions from her duties as a juror and that she would not have been stricken for cause by a reasonable judge had she honestly answered the questions posed. Considering the factors discussed in Sampson v. United States, 724 F.3d 150, 165–66 (1st Cir. 2013), the court reasoned that: (1) Juror 86 withheld information about herself and about close family members -- her sons and her husband -- which weighed in favor of the defendants; (2) Juror 86 was "unemotional" and "calm," a factor favoring the government; (3) although most of the charges against Juror 86's sons were distinct from the charges against French and Russell, the

---

[2] Counsel for French also called Juror 86's husband to testify and asked whether he was aware that Juror 86's older son had been arrested for marijuana. He indicated that he was, but that he could not remember exactly when the arrest took place.

In addition, French's counsel called Dr. Charles Robinson, a forensic psychologist and expert in memory, who suggested that Question 3(a) was of the sort that would normally trigger memories of earlier interactions with the court system.

- 11 -

similarity of the older son's marijuana trafficking charge slightly favored the defendants; (4) the scope and severity of the inaccuracies slightly favored the government; and (5) no answer had been found as to "why Juror 86 failed to accurately and honestly answer Question 3 in October 2013, why she did not reveal this information during voir dire in January 2014, [or] why she testified in such a contradictory and confusing manner in February 2019."  All together, the court concluded that "if the Magistrate Judge and counsel had been made aware of Juror 86's sons' marijuana convictions, the convictions would not have provided a valid basis for a challenge for cause."  The court therefore denied the motion for a new trial, and this second appeal followed.

## II.

"[W]e review claims that a trial court failed to conduct an appropriate inquiry into allegations of jury taint for abuse of discretion."  United States v. Paniagua-Ramos, 251 F.3d 242, 249 (1st Cir. 2001) (citing United States v. Boylan, 898 F.2d 230, 258 (1st Cir. 1990)).  Likewise, "[w]e review a district court's denial of a motion for new trial for abuse of discretion."  Id. (citing United States v. Huddleston, 194 F.3d 214, 218 (1st Cir. 1999)).

## A.

The first of the two questions before us is whether the district court abused its discretion in fashioning and executing

a procedure on remand to investigate the defendants' allegations of juror bias.  After careful review, we conclude that it did not.

On their first appeal, we held that French and Russell had raised "colorable or plausible" allegations of Juror 86's bias in the district court, French, 904 F.3d at 120, and thus that a "court-supervised investigation aimed at confirming and then exploring further the apparent dishonesty was called for," id. at 117.  When investigating allegations of juror bias, the "primary obligation" of the district court "is to fashion a responsible procedure for ascertaining whether misconduct actually occurred and if so, whether it was prejudicial." Id. (quoting United States v. Zimny, 846 F.3d 458, 465 (1st Cir. 2017)); see also United States v. Rodriguez, 675 F.3d 48, 58 (1st Cir. 2012); Paniagua-Ramos, 251 F.3d at 249-50 (explaining that the district court must select "a sensible procedure reasonably calculated to determine whether something untoward had occurred" and then "even-handedly implement" it).  The aim of such a procedure is "to ensure that the parties 'receive[] the trial by an unbiased jury to which the Constitution entitles them.'"  United States v. Bristol-Mártir, 570 F.3d 29, 42 (1st Cir. 2009) (alteration in original) (quoting Boylan, 898 F.2d at 289-90).  However, in meeting this obligation, "[t]he type of investigation the district court chooses to conduct is within [its] discretion." French, 904 F.3d at 117.  Because "claims of jury taint are almost always case-specific," Paniagua-

Ramos, 251 F.3d at 250, the district court takes responsibility for appropriately calibrating its inquiry to the circumstances presented. See Rodriguez, 675 F.3d at 61 (explaining that "the circumstances of each case . . . will determine the level of inquiry necessary").

"The touchstone" of our appellate review is "reasonableness." Paniagua-Ramos, 251 F.3d at 249. "So long as the district judge erects, and employs, a suitable framework for investigating the allegation and gauging its effects, and thereafter spells out [her] findings with adequate specificity to permit informed appellate review, [the court's] 'determination . . . deserves great respect [and] . . . should not be disturbed in the absence of a patent abuse of discretion.'" Boylan, 898 F.2d at 258 (third alteration in original) (citation omitted) (quoting United States v. Hunnewell, 891 F.2d 955, 961 (1st Cir. 1989)); see also Zimny, 846 F.3d at 472 (explaining that the case law in this circuit "emphasize[s] the district court's discretion in determining 'the scope of the resulting inquiry and the mode and manner in which it will be conducted'" (quoting Paniagua-Ramos, 251 F.3d at 250)).

In this case, the district court responded to the gravity of the defendants' claims of bias with a formal evidentiary hearing -- the gold standard for an inquiry into alleged juror misconduct. Cf. French, 904 F.3d at 117. While we have not

- 14 -

required that district courts always implement a full evidentiary proceeding in response to an allegation of juror bias, in some circumstances a formal hearing may be required. Id. The fact that juror bias constitutes a structural defect "not susceptible to harmlessness analysis," id. at 119, along with the difficulties inherent in questioning a juror several years after the end of trial, further rendered the district court's response appropriate.

Additionally, the procedures that the district court adopted and implemented for the evidentiary hearing were rigorous and well thought-out. During the hearing, Juror 86 testified at length under oath, and all parties were permitted to be present throughout the questioning and to cross-examine Juror 86. The district court afforded wide latitude to counsel in asking questions at the hearing and admitted evidence and stipulations. This is not a situation where the court simply let the juror decide for herself whether she was biased without investigating further. Contra United States v. Rhodes, 556 F.2d 599, 601 (1st Cir. 1977).

The defendants nonetheless contend that the court abused its discretion in fashioning procedures to investigate Juror 86's alleged bias. Russell challenges the court's decision to appoint counsel for Juror 86, and both defendants object to the court's

decision not to question Juror 86 from the bench.[3]  Neither of these contentions persuades us.

## 1.

The defendants point to no case holding that a court investigating juror bias or misconduct may not appoint counsel for the juror.  And we know of at least one reported case in which another district court appointed counsel for a juror.  See United States v. Lawson, 677 F.3d 629, 640 n.13 (4th Cir. 2012). Appointing counsel for Juror 86 posed advantages and disadvantages for the court's inquiry.  On the one hand, it may have increased the likelihood that the juror would take the inquiry seriously and would refresh her memory before showing up at the courthouse (as, indeed, she did).  On the other hand, it might have made her responses more guarded.  Additionally, appointing counsel mitigated the potential consequences of the court's inquiry for Juror 86 herself, including the possibility of contempt sanctions and the potential financial burden of having to retain counsel independently.  These considerations, among others, call for judgment and discretion, not a rule of law.  Further, nothing in Juror 86's actual testimony suggests that the investigation into

---

[3] Russell also argues that the district court improperly "elevat[ed] 'motive' to be a sine qua non [of] proving reversible bias or a valid basis for cause."  We address this argument as part of our discussion of the defendants' substantive arguments in Part II.

her bias would have gone differently if the court had not appointed counsel. Thus, we have no basis for finding that the district court abused its discretion in choosing a "methodologically sound" means of investigating juror bias. See United States v. Bradshaw, 281 F.3d 278, 291 (1st Cir. 2002).

## 2.

Nor do we find any abuse of discretion in the district court's decision to rely on direct- and cross-examination by counsel rather than questioning Juror 86 from the bench. The appropriateness of questioning witnesses or jurors from the bench varies depending on the circumstances. For example, while judges are permitted to ask questions at trial, see Fed. R. Evid. 614, such questioning is not always beneficial because it can give rise to claims of favoritism and taint jurors' perceptions of a judge's impartiality, see, e.g., United States v. Rivera-Rodríguez, 761 F.3d 105, 111 (1st Cir. 2014). By contrast, it is sometimes preferable for judges to question potential jurors from the bench during voir dire, see Fed. R. Crim. P. 24(a), so that counsel may avoid making potential jurors uncomfortable and thereby avoid the risk of prejudicing their clients before trial even begins.

Post-trial examinations of a juror present different practicalities. For example, sometimes the focus of the examination is obvious, making it most practical for the court to simply ask what it needs to know. See, e.g., Zimny, 846 F.3d at

465-66; Paniagua-Ramos, 251 F.3d at 249-50; Tavares v. Holbrook, 779 F.2d 1, 2-3 (1st Cir. 1985). On other occasions, such as in the circumstances presented in this case, protracted and far-ranging inquiry may be required, making it less practical for the judge to direct the questioning. Further, counsel need not be as hesitant to interrogate a juror post-trial as they might have been pre-trial because there is little to no risk that annoying the juror will prejudice their clients. Thus, we see no obvious reason why competing post-trial examinations of a juror by counsel would be insufficient to reveal any bias held by that juror.

Against this background of alternative approaches that can be tailored to the needs of the specific case, our standard of review does not call on us to second-guess the district court's decision to have competent counsel alone do the questioning. See Paniagua-Ramos, 251 F.3d at 250 (declining "to second-guess the lower court's judgment as to what methodology was best calculated to get at the truth in this instance"); United States v. Ortiz-Arrigoitia, 996 F.2d 436, 443 (1st Cir. 1993) ("The trial judge is not . . . shackled to a rigid and unyielding set [of] rules and procedures that compel any particular form or scope of inquiry.").

Our decision in Bristol-Mártir, 570 F.3d at 43, is not to the contrary. In that case, we found an abuse of discretion because the jurors had not been questioned at all -- by the court

or counsel -- as to whether they were unduly influenced by one juror's presentation of improper outside research. Id. Bristol-Mártir does not suggest that the district court must always conduct the questioning. The defendants also point to Dyer v. Calderon, 151 F.3d 970 (9th Cir. 1998), where the Ninth Circuit admonished the trial court of its "independent responsibility to satisfy [itself] that [an] allegation of bias is unfounded." Id. at 978. Dyer, though, involved a situation where defense counsel were not themselves in a position to aggressively question the juror, as the trial was still underway. Id.

Russell's reliance on United States v. Resko, 3 F.3d 684 (3d Cir. 1993), does not help his position either. There, the only effort made by the district court to investigate the claims of juror misconduct was to distribute a questionnaire asking jurors whether they had talked to other jurors during the trial and whether they had formed an opinion as to guilt because of those conversations. Id. at 688, 690. Neither the district court nor counsel engaged in individualized questioning of the jurors, and the responses to the questionnaire supplied insufficient information to rout out any potential prejudice. Id. at 690-91.

In sum, the questioning undertaken by counsel was sufficient to address the defendants' concerns of Juror 86's bias. Indeed, the defendants complain of no question that they were not allowed to ask Juror 86. Accordingly, we find no abuse

of discretion by the district court in adopting and implementing procedures to investigate the claims of juror bias on remand.

## B.

Turning to the defendants' substantive argument that the district court erred in denying the motion for new trial, we again find no abuse of discretion warranting a new trial.

"To obtain a new trial based on a juror's failure to respond accurately to questions asked of prospective jurors prior to their selection to sit as jurors, 'a [defendant] must first demonstrate that a juror failed to answer honestly a material question on voir dire.'" French, 904 F.3d at 116 (emphasis omitted) (quoting McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984)). Second, the defendant must "further show that a correct response would have provided a valid basis for a challenge for cause." Id. (quoting McDonough, 464 U.S. at 556). The party seeking to overturn the jury's verdict bears the "burden of showing the requisite level of bias by a preponderance of the evidence." Sampson, 724 F.3d at 166.

The second element -- whether a correct response would have given rise to a valid basis for a challenge for cause -- depends on whether "a reasonable judge, armed with the information that the dishonest juror failed to disclose and the reason behind the juror's dishonesty, would conclude . . . that the juror lacked the capacity and the will to decide the case based on the

evidence." Id. at 165-66.  This inquiry is both context-specific and fact-specific and must be based on the "totality of the circumstances," including:       "the juror's interpersonal relationships; the juror's ability to separate her emotions from her duties; the similarity between the juror's experiences and important facts presented at trial; the scope and severity of the juror's dishonesty; and the juror's motive for lying."  Id. (citations omitted).

The information about Juror 86's sons' involvement with marijuana use and sales was plainly material to this case (although she could not have known that when she deemed it "not applicable").  It might have engendered strong emotions that would cause her to perform poorly as a juror.  It might have made her sympathetic to defendants charged with marijuana usage.  Or it might have made her angry at someone who manufactured marijuana.  For these reasons, we previously concluded that Juror 86's dishonest conduct raised a "colorable or plausible" claim of the type of bias that could warrant a new trial.  French, 904 F.3d at 120.  Thus, an investigation of the facts was necessary.  See id.

That investigation let much of the air out of the balloon.  No connection between Juror 86's sons and the defendants was shown.  The charges against her sons, while involving illegal drugs, bore little relationship to the large-scale manufacturing operation that the defendants were charged with running.  Juror 86

- 21 -

offered no hint that she held either the defendants or the government responsible for her sons' circumstances. Further, none of the drug crimes involved Juror 86 herself. In the judgment of the experienced trial judge who watched her testify for over two hours, she displayed no strong emotions that may have fueled a bias. And there is no suggestion in the record that she lied to get on the jury in this case.

The defendants place great emphasis on the fact that the district court ultimately could not determine exactly why Juror 86 filled out her questionnaire inaccurately or failed to respond to the relevant questions posed during oral voir dire. But the court did exclude the explanations that would most likely cause concern. Juror 86 was not a habitual liar; she did not employ deceit in order to get on the jury in this case; and her conduct was not the product of undue emotion. Further, as noted above, Juror 86 was not a party to any criminal charges, and her sons had no apparent connection with anyone involved in this case. While not exhaustive, these findings left no likely explanation that would reveal any disqualifying bias toward either the defendants or the government.

Moreover, Juror 86 testified that she had possessed limited information about the specifics of her sons' charges. Juror 86 had herself smoked marijuana in the distant past, indicated that she lacked strong opinions about the

legalization of marijuana, and reiterated that her sons' marijuana use did not particularly concern her. By contrast, the juror whose bias led us to vacate a death penalty in Sampson expressed that she was "deeply ashamed" about her daughter's conviction. 724 F.3d at 168; see also id. at 167 (observing that the juror "could not discuss those matters candidly, unemotionally or, often, coherently" (quoting United States v. Sampson, 820 F. Supp. 2d 151, 193 (D. Mass. 2011))).

Russell's reference to the example of Juror 10, who was excused for cause by the magistrate judge based on her answers to the juror questionnaire, does not change the result. Like the juror in Sampson, and unlike Juror 86, Juror 10 had been "clearly emotional" about her son's marijuana charges. Although the defendants suggest that Juror 86 was unemotional because her counsel had coached her on how to appear "calm," this assertion is speculative and therefore does not disturb the experienced trial judge's determination that Juror 86 was "remarkably unemotional."

Of course, the "reason behind the juror's dishonesty" is important when considering whether a reasonable judge would strike the juror for cause. French, 904 F.3d at 118 (quoting Sampson, 724 F.3d at 165-66). But not all motives are equally alarming. As the Supreme Court has explained, while "motives for concealing information may vary, . . . only those reasons that affect a juror's impartiality can truly be said to affect the fairness of

- 23 -

a trial." McDonough, 464 U.S. at 556. Here, the testimony elicited at the evidentiary hearing and the district court's findings eliminated the motives that usually tend to show bias, and there is no suggestion in the record that Juror 86 had some other motive that would cast doubt on her impartiality. We simply have a juror who, as she explained, decided that the information about her family was "not applicable." Although the reasons why she felt that way remain unclear, the lack of clarity, by itself, does not dictate a finding that she possessed a disqualifying bias. Indeed, we see in the record little if any evidence that Juror 86 was biased in any way adverse to the defendants.

The defendants assert that Juror 86's memory loss caused the lack of clarity and that the burden should therefore be shifted from them to the government, citing to the following cautionary language in French:

> If the staleness of the memories resulting from t[he] additional two-year period [of delay between the defendants' filing of a motion for new trial and our decision in French] becomes a problem that cannot be solved on remand, we think it only fair for that to cut against the government.

904 F.3d at 120. But the district court supportably concluded that the record lacked evidence of any lapse in Juror 86's memory caused by the two-year delay. The defendants object that the district court should have held any and all lapses in Juror 86's memory against the government -- including memory lapses resulting

- 24 -

from the earlier period of time between jury selection and their first motion for a new trial, as well as memory lapses resulting from the later period of time between our decision in French and the evidentiary hearing on remand. But this argument overlooks the general rule that the party seeking to overturn the jury's verdict bears the "burden of showing the requisite level of bias by a preponderance of the evidence." Sampson, 724 F.3d at 166. Although our decision in French noted that an exception to the general rule might apply if Juror 86's memory loss became "a problem that [could not] be solved on remand," 904 F.3d at 120, that possibility did not come to pass. To the contrary, as we have already explained, the district court was able to exclude the most obvious indicators of bias from the evidence that was in the record. And, with those most concerning motivations excluded, the defendants failed to posit any other concerning motive that might explain the juror's conduct but that the passage of time prevented them from uncovering.

The fact that a prospective juror has a family member who has run afoul of laws against drug possession does not by itself disqualify a juror from sitting on a jury in a case like this. Rather, it invites further inquiry to see if the family member's experience has likely affected the ability of the prospective juror to be fair. In this instance, that follow-up inquiry was doubly warranted because Juror 86 initially withheld

reporting her sons' experiences. That withholding suggested that she might have had strong feelings one way or the other concerning criminal prosecutions relating to marijuana. As we have described, the district court conducted that inquiry. In addition to confirming that the experiences Juror 86 omitted were not her own, the district court's inquiry turned up significant facts that were not known at the time of the defendants' first appeal: It revealed that the experiences of Juror 86's family members were quite different from those of the defendants; that Juror 86 was not especially emotional about the subject; and that any inference of any bias adverse to defendants was weak. Although the inquiry did not illuminate the exact reason for Juror 86's dishonest conduct, it also did not yield any evidence that her dishonesty was motivated by bias or that the facts she had concealed would have otherwise affected her ability or desire to be impartial. Based on this information, and after observing Juror 86 testify for roughly two hours, the experienced trial judge found that she lacked the type of bias that would disqualify her

for cause.[4]  We hold, simply, that the trial judge did not abuse his discretion in making that determination.

### III.

Based on the foregoing, we <u>affirm</u> the district court's denial of the defendants' motion for a new trial.

---

[4]  Accordingly, we reject Russell's argument that the district court improperly elevated motive to be a "sine qua non" of proving reversible bias.  Similarly, we are not persuaded that the evidence other than the evidence of motive tilted toward disqualification.